Timothy BRYANT, Maurice Cassidy, Joseph Defilippis, Jessica Dyson, Leonard Gay, Robert Takacs, Ulrik Trojaborg, Plaintiffs–Appellants,

v.

CITY OF NEW YORK; City of New York Police Department; Rudolph Giuliani individually and in his official capacity as Mayor of the City of New York; Howard Safir, individually and in his official capacity as Police Commissioner of the NYPD; Allan Hoehl, individually and in his official capacity as Police Chief of the New York City Police Department; and "John Doe," an unknown police officer employed by the City of New York, Defendants–Appellees.

Docket No. 04–0199–CV.

United States Court of Appeals, Second Circuit.

Argued: Nov. 30, 2004.

Decided: April 5, 2005.

James Reif, New York, New York (Gladstein, Reif & Meginniss, New York, New York, Daniel L. Alterman, Alterman & Boop, New York, New York, on the brief), for Plaintiffs–Appellants.

Norman Corenthal, Assistant Corporation Counsel, New York, New York (Michael A. Cardozo, Corporation Counsel of the City of New York, Kristin M. Helmers, Senior Counsel, New York, New York, on the brief), for Defendants–Appellees.

Before: KEARSE, SACK, and HALL, Circuit Judges.

KEARSE, Circuit Judge.

Plaintiffs Timothy Bryant *et al.*, who were arrested and charged with disorderly conduct during a large public event, appeal from a judgment of the United States District Court for the Southern District of New York, Lawrence M. McKenna, *Judge*, dismissing their second amended complaint ("complaint") alleging principally that defendants City of New York (the "City"), its police department, mayor, and certain police officers and officials violated plaintiffs' rights under federal and state law in connection with plaintiffs' arrests and postarrest processing. Plaintiffs asserted, *inter alia*, that their due process rights were violated by defendants' failure to release them shortly after their arrests. The district court granted defendants' motion for summary judgment dismissing the constitutional claims, finding chiefly that the due process claims were untenable because plaintiffs had failed to show either (a) a protected liberty interest, or (b) if such an interest existed, any impact on that interest sufficient to create an issue of constitutional dimension. The court declined to exercise supplemental jurisdiction over plaintiffs' state-law claims. On appeal, plaintiffs contend principally that the district court erred in assessing their due process claims. Defendants contend, *inter alia*, that plaintiffs' claims of undue delays in being released from custody should be analyzed under the Fourth Amendment rather than under more general principles of due process, but that the claims cannot survive analysis under either framework. For the reasons that follow, we agree with defendants that the Fourth Amendment provides the proper analytical framework for those claims and that they were properly dismissed.

## I. BACKGROUND

This case arises out of a "rally/vigil" held in New York City on the evening of Monday, October 19, 1998, to "protest anti-gay violence" (complaint ¶ 7) and honor the memory of Matthew Shepard, a gay college student who had been murdered in Wyoming (*id.* ¶ 36) one week earlier. The event ("Shepard demonstration") was scheduled to begin with a gathering at approximately 6:00 p.m. at the intersection of 59th Street and Fifth Avenue; the participants were to march down the sidewalk on Fifth Avenue from 59th Street to Madison Square Park, located between 26th and 23rd Streets, where the Shepard demonstration would conclude with speeches.

Most of the plaintiffs were participants in the event. They were arrested and charged with disorderly conduct when they walked or stood in the roadway and failed

to return to the sidewalk when ordered to do so by police officers; most were taken to a police station; all were held overnight, or at least until after midnight, and then released. None were convicted.

To the extent pertinent to this appeal, the details as to these events are not in dispute except as indicated below, having been (A) asserted principally in Defendants' Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("Defendants' 56.1 Stmt.") submitted in support of their motion for summary judgment, and not disputed in accordance with that Rule by Plaintiffs' Rule 56.1 Statement in Opposition to Defendants' Motion for Summary Judgment ("Plaintiffs' Opp. 56.1 Stmt."); or (B) asserted by plaintiffs in a Rule 56.1 statement submitted in support of a cross-motion for summary judgment in plaintiffs' favor on certain of their state-law claims ("Plaintiffs' Cross–Motion 56.1 Stmt.") and not disputed by defendants. We view the record in the light most favorable to plaintiffs, as the parties against whom summary judgment was granted.

A. *The March*

It was anticipated that the Shepard rally/vigil on October 19 would be attended by some 200 persons. No permit was obtained (*see* Defendants' 56.1 Stmt. ¶ 14), as "[i]t was understood" that the walk "was to be a sidewalk march" (Plaintiffs' Opp. 56.1 Stmt. ¶ 14), and "[n]o permit is required for a 'sidewalk march' " (*id.*).

As it turned out, however, by the end of the evening the rally and march had attracted some 4,000 participants. (*See* Defendants' 56.1 Stmt. ¶¶ 16–17; Plaintiffs' Opp. 56.1 Stmt. ¶ 16.) Initially, 100 police officers had been assigned to the Shepard demonstration; as the number of participants grew, and overflowed the sidewalks, some 1,500 police officers were mobilized for crowd-control. (*See* Defendants' 56.1

Stmt. ¶¶ 15, 43; Plaintiffs' Opp. 56.1 Stmt. ¶¶ 16, 43.) After the marchers began to pour down Fifth Avenue, the police erected barricades, diverting the marchers west on 56th Street one block to Avenue of the Americas, then south to 54th Street, and then east one block to Fifth Avenue where they again were allowed to proceed south.

According to defendants, who presented a videotape of the event to support their assertions, uniformed police officers made announcements to the crowd by use of bullhorn loud speakers. Those announcements included statements that the participants were required to remain on the sidewalks and were not allowed to walk on or remain in the roadway; that if the participants remained on the sidewalks they would be escorted to Madison Square Park; and that persons who remained in the roadway would be arrested. (*See* Defendants' 56.1 Stmt. ¶¶ 19–24.) In response to these Rule 56.1 assertions, plaintiffs stated only that several plaintiffs did not hear the announcements that they should stay on the sidewalk and would be arrested if they failed to do so. (*See* Plaintiffs' Opp. 56.1 Stmt. ¶¶ 19–24.)

Supported by additional citations to the videotape, defendants asserted that despite the police announcements, a large group of participants entered the roadway at Fifth Avenue and 59th Street, locked arms, and obstructed traffic; that demonstrators were encouraging each other to enter the roadway; that one demonstrator with a bullhorn told other participants, "if you are willing to take arrests, please move into the street"; that many individuals then sat down in the roadway; that demonstrators in the street chanted, "WHO'S STREET? OUR STREET!" and "TAKE THE STREETS!"; that at that time, persons who remained in the roadway were arrested; and that during the time that police officers were attempting

to arrest persons who initially went into the roadway, the remaining thousands of demonstrators flooded the street and proceeded to march down Fifth Avenue. (Defendants' 56.1 Stmt. ¶¶ 25–31.) In response to these assertions, plaintiffs stated that none of the plaintiffs engaged in this conduct, but they did not dispute that such conduct occurred as described. (*See* Plaintiffs' Opp. 56.1 Stmt. ¶¶ 25–31.)

The parties disputed whether there was vehicular traffic on Fifth Avenue south of 59th Street. Defendants asserted that the crowds walking in the roadway interfered with vehicular traffic, caused significant safety hazards to the occupants of numerous vehicles, including cars, trucks, and public buses, and caused significant delays and disruptions to the flow of traffic in and around midtown Manhattan. (*See* Defendants' 56.1 Stmt. ¶ 33.) Plaintiffs asserted that there was no vehicular traffic on Fifth Avenue south of 59th Street because Fifth Avenue had been blocked by the police at 59th Street. (*See* Plaintiffs' Opp. 56.1 Stmt. ¶ 33.)

### B. *The Arrests of the Plaintiffs*

In the course of the Shepard demonstration, 115 people, including the seven named plaintiffs, were arrested and charged with disorderly conduct. (*See* Defendants' 56.1 Stmt. ¶ 9; Plaintiffs' Opp. 56.1 Statement ¶ 187.) The six plaintiffs other than Leonard Gay were arrested as they stood or walked in the street. Although those six contended that they either were approaching a sidewalk when arrested, or that there was no room on the sidewalk, or that there were impediments to their reaching the sidewalk, there is no dispute that, when arrested, they were in a roadway. (*See, e.g.,* Defendants' 56.1 Stmt. ¶¶ 65–67 (Bryant), ¶ 117 (Jessica Dyson), ¶ 82 (Maurice Cassidy), ¶¶ 103–104 (Joseph DeFilippis), ¶¶ 161–162 (Robert

Takacs), ¶¶ 182–184 (Ulrik Trojaborg); corresponding paragraphs of Plaintiffs' Opp. 56.1 Stmt.)

Plaintiffs were kept in custody between 5 and 23 hours before being released. Bryant and Dyson were arrested at Fifth Avenue and 59th Street at approximately 6:30 p.m. They were taken to central booking and held in cells overnight. On the following day, October 20, 1998, Bryant was arraigned and was released at about noon. (*See* Declaration of Timothy Bryant dated October 22, 2002, ¶ 24.) He was tried on November 17, 1998, and was acquitted. (*See* Plaintiffs' Cross–Motion 56.1 Stmt. ¶ 7.) Dyson was arraigned on October 20, 1998, and released between 4:30 and 5:30 p.m. (*See* Declaration of Jessica Dyson dated October 23, 2002, ¶ 33.) On November 25, 1998, the charge against her was dismissed on motion of the prosecution. (*See People v. Dyson,* No. 98N095968, Criminal Court of the City of New York, New York County, Hearing Transcript, November 25, 1998, at 2.)

Cassidy and DeFilippis were arrested at 56th Street and Avenue of the Americas at approximately 7:00 p.m. They were placed on city buses that had been commandeered, and they were held on the buses until approximately 1:00 a.m. and 1:30 a.m., respectively, at which times the police released them and voided their arrests. (*See* Defendants' 56.1 Stmt. ¶¶ 84, 107; Plaintiffs' Opp. 56.1 Stmt. ¶¶ 83, 107.)

Takacs was arrested at approximately 7:00 p.m. in the middle of 54th Street. Trojaborg was arrested at approximately 7:15 p.m. at 54th Street and Avenue of the Americas. Each was taken to a police station and held in a cell. Takacs was released after midnight (*see* Defendants' 56.1 Stmt. ¶ 171; Plaintiffs' Opp. 56.1 Stmt. ¶ 171); Trojaborg was released at approximately 4:00 a.m. (*see* Defendants' 56.1 Stmt. ¶ 185; Plaintiffs' Opp. 56.1

Stmt. ¶ 185); and their arrests were voided (*see* Plaintiffs' Cross–Motion 56.1 Stmt. ¶¶ 38, 43).

Gay joined the march late, attended part of the rally at Madison Square Park, and then began to leave the area. He stopped near Fifth Avenue and 25th Street to observe what appeared to be the recording of a television interview. Police officers repeatedly asked Gay to step away from the press area. When he refused after the final request, he was arrested. (*See* Defendants' 56.1 Stmt. ¶¶ 136–138.) Gay contended that no one told him "he was in a restricted area." (*E.g.*, Plaintiffs' Opp. 56.1 Stmt. ¶¶ 126–129, 136–137.) Gay was arrested at approximately 9:45 p.m., charged with two counts of disorderly conduct, and held in a cell until he was taken to criminal court the next morning. (*See* Defendants' 56.1 Stmt. ¶¶ 148, 144, 146.) He was arraigned and then released at approximately 12:15 p.m. (*See* Defendants' 56.1 Stmt. ¶ 147; Plaintiffs' Opp. 56.1 Stmt. ¶ 147.) Gay received an Adjournment in Contemplation of Dismissal in April 1999; the charges against him were dismissed on October 6, 1999. (*See* Plaintiffs' Cross–Motion 56.1 Stmt. ¶ 33.)

## C. *The Present Action*

Plaintiffs commenced the present action under 42 U.S.C. § 1983 in November 1999 and filed their second amended complaint in January 2002, asserting claims of, *inter alia*, false arrest, false imprisonment, malicious prosecution, assault, battery, use of unreasonable force, and violations of their rights under the First, Fourth, and Fourteenth Amendments to the Constitution. Their principal constitutional contention was that defendants deprived them of substantive due process by not releasing them sooner pursuant to a New York Criminal Procedure Law provision that gives a police officer discretion in certain cases to issue a so-called desk appearance ticket ("DAT") to an arrestee rather than holding him or her in custody until a judge is available to conduct an arraignment. Under this procedure, the arrestee is released and must return to the criminal court at a future date for arraignment. *See* N.Y.Crim. Proc. Law §§ 150.10(1), 150.20 (McKinney 2004). The complaint alleged that

> Those Plaintiffs who were formally charged with a crime or violation, to wit, Bryant, Dyson, Gay and [others] ... were deprived of desk appearance tickets by Defendants despite their eligibility for same. These deprivations were arbitrary, capricious and discriminatory and were predicated on Plaintiffs' actual or perceived participation in the aforesaid rally. As a consequence of Defendants' denials to the aforesaid Plaintiffs of desk appearance tickets, said Plaintiffs were needlessly incarcerated and otherwise detained overnight ....

(Complaint ¶ 197.) The complaint alleged that the wholesale denial of DATs was pursuant to an "official municipal policy, custom and usage" (*id.* ¶ 195) and that the denials deprived plaintiffs of their rights to "(a) freedom of expression, (b) the rights to assemble peaceably, to petition for redress of grievances and to be free of unreasonable seizures, (c) the equal protection of the laws and (d) liberty and property without due process of law" (*id.* ¶ 198).

After a period of discovery, defendants moved pursuant to Fed.R.Civ.P. 56 for summary judgment dismissing the complaint. In support of their motion they submitted, *inter alia*, the videotape of the event, adverted to in Part I.A. above, as evidence of the nature of the event. With respect to the denial of DATs, defendants relied on the deposition testimony of Louis Anemone, who was the City's police chief

at the time of the Shepard demonstration and was in command of the police operation on the night of the event.

Anemone testified that, although he did not "know for certain" whether he had ordered that none of the arrestees be issued DATs (Deposition of Louis Anemone ("Anemone Dep.") at 48), he surmised, based on his past practices, that he had given such an order (see id. at 51). Such an order would have been warranted by the arrestees' "actions during the course of the demonstration; their violation of police direction; [and] their actions to endanger the public safety." (Id. at 48–49.) Anemone stated that

> [t]he group, from my perspective, was a violent mob. It was out of control. There was very little leadership, or any, that anyone on the police side could detect. So it's the worst kind of a group to be handling and dealing with in an unrestrained manner .... To me it was crystal clear that they should ... not be given the privilege of a desk appearance ticket because this would probably end up becoming a bigger problem for us later on that evening ....

(Id. at 56.) Anemone testified that officers on the scene had indicated to him that the persons arrested "were very likely to continue to engage in" the actions for which they had been arrested. (Id. at 49.) By holding the 115 arrestees rather than immediately releasing them, the police department was able to assure that "this hundred and fifteen of the most violent" members of the crowd were kept under control. (Id. at 57.)

Anemone also testified that "a number of people ... resisted arrest. Although it may not have caused an injury on the part of the police officer, force was needed to affect [sic] those arrests. Each one of those situations presents a possibility of additional violence or injuries." (Id. at 59.) He noted that "two officers had been injured already." (Id. at 58.)

In addition, Anemone testified that a DAT requires considerably more paperwork than the normal processing of an arrestee (see id. at 70) and that the arresting officer must be present for the completion of the DAT paperwork (see id. at 71). In contrast, if the arrestee is processed normally "[t]he officer can be quickly redeployed back to the street.... If you're using a desk appearance ticket process, the officer is lost to the commander on the street while he's engaged in this process." (Id.) Thus, one consequence of using DATs during an ongoing demonstration is a potential diminution of police ability to maintain order. (See id at 72.)

Anemone also believed that "the arrest and arraignment process are [sic] frustrated by the use of" DATs "[b]ecause many of those people issued desk appearance tickets never show up ... on their return date. Warrants end up being issued. At one point we had over a hundred thousand active warrants in the N.Y.P.D." (Id. at 66–67.)

In a Memorandum and Order dated December 2, 2003, see Bryant v. City of New York, 2003 WL 22861926 (S.D.N.Y. Dec.2, 2003) ("Bryant I"), the district court granted defendants' motion for summary judgment dismissing plaintiffs' federal claims. To the extent pertinent to this appeal, the district court dismissed plaintiffs' claims that their rights to due process had been violated by defendants' failure to issue DATs, ruling that, for two reasons, plaintiffs had not "demonstrated that a constitutional violation took place." Bryant I, 2003 WL 22861926, at *7. First, the court found that an arrestee is not entitled to a DAT as a matter of right:

> New York state law does not create a protected right in the issuance of a desk appearance ticket; its issuance is purely

discretionary. Under New York law, a defendant has no constitutional or statutory right to a DAT, and a police officer who has arrested a defendant for a misdemeanor may choose instead to retain custody of the defendant until his arraignment in a local Criminal Court....

. . . .

In this case, the Plaintiffs suggest that because they met the criteria set forth in the regulations for issuing desk appearance tickets, the police should have issued them. At the very least, they argue the decision was ill-founded....

. . . .

[But t]he statute governing the issuance of desk appearance tickets ... has no ... mandatory language: "Whenever a police officer is authorized ... to arrest a person without a warrant ..., he *may* ... issue to and serve upon such person an appearance ticket." N.Y.Crim. Proc. Law § 150.20(1) (emphasis added).... Both parties agree that Plaintiffs have a constitutionally protected right to due process before [being] deprived of their liberty. Defendants argue, however, that this right attaches to the arrest as a whole, and not solely to a discretionary procedure designed to ease the burden on the court and corrections system.... The Court agrees.

*Bryant I*, 2003 WL 22861926, at *9–*11 (other internal quotation marks omitted) (emphasis in *Bryant I* ).

Second, the court found that even if plaintiffs had been entitled to DATs under New York law, defendants' decision to deny plaintiffs that right did not reach the level of a federal constitutional violation because the decision did not shock the conscience, which is the standard for a substantive due process violation:

Plaintiffs also fall short with respect to the second prong of the substantive due process analysis. Even if the Plaintiffs had a right in the issuance of a desk appearance ticket, Defendants' behavior in denying them did not rise to the level necessary to sustain a substantive due process claim....

.... [R]ather than being irrational, the decision not to issue desk appearance tickets was based in part, according to Anemone, on a decision that the participants in the demonstration were violating police directives, were a threat to police and public safety, would potentially continue their illegal activity, and were part of an uncontrollable group. (Anemone Dep. at 48–49, 56.) Although Plaintiffs question the validity of these reasons ..., *Anemone also stated a desire to preserve police manpower resources and to save paperwork, which Plaintiffs do not address.* (Anemone Dep. at 70–71.) It cannot be said, without more, when an event leads to the arrest of 115 people, that a decision not to issue desk appearance tickets violates the Plaintiffs' substantive due process rights. It is not "arbitrary or conscience-shocking in the constitutional sense." *Lowrance[ v. Achtyl* ], 20 F.3d [529,] 537 [(2d Cir.1994)].

*Bryant I,* 2003 WL 22861926, at *11–*12 (emphasis added).

As for plaintiffs' other constitutional claims, the court found that plaintiffs had not pointed to evidence either showing that the motivation for the denial of desk appearance tickets implicated their First Amendment rights, or tending to show that defendants acted with the intent necessary to establish a claim under the Equal Protection Clause. *See id.* at *14–*15. Having rejected all of plaintiffs' federal claims, the court declined to exercise supplemental jurisdiction over their state-

law claims, and it dismissed those claims without prejudice. *See id.* at *15. A motion by plaintiffs for class certification was denied as moot. *See id.* at *15 n. 10. Judgment was entered accordingly.

On this appeal, although the notice of appeal states that plaintiffs challenge "each and every part" of the judgment (plaintiffs' notice of appeal dated January 7, 2004), their brief addresses only the district court's dismissal of their due process claims for denial of DATS, and urges, conditionally, that if that dismissal is vacated, we should vacate as well the discretionary dismissal of the state-law claims and the denial of the class certification motion. Accordingly, we will address only the denial-of-DATs claims and the arguments that hinge on their reinstatement, all other issues having been abandoned. *See generally Otero v. Bridgeport Housing Authority,* 297 F.3d 142, 144 (2d Cir.2002); *Day v. Morgenthau,* 909 F.2d 75, 76 (2d Cir.1990); Fed. R.App. P. 28(a)(9).

## II. DISCUSSION

■ In the proceedings in the district court, both the parties and the court analyzed plaintiffs' claims that their constitutional rights were violated when defendants denied them desk appearance tickets, thereby prolonging their postarrest detentions, as claims under the Due Process Clause. On this appeal, defendants argue, *inter alia,* that this type of claim is properly governed by the Fourth Amendment. Although we agree with the district court that defendants' conduct in denying DATs did not reach the "conscience-shocking level" that would be necessary to support a claim of denial of substantive due process, *County of Sacramento v. Lewis,* 523 U.S. 833, 849, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998); *see, e.g., Collins v. City of Harker Heights,* 503 U.S. 115,

128, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992), we agree with defendants that the Fourth Amendment provides the proper analytical framework, and we affirm the dismissal under that framework.

The Due Process Clause of the Fourteenth Amendment provides that no person shall be deprived of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Due Process Clause was intended to prevent government officials "from abusing [their] power, or employing it as an instrument of oppression," *Collins,* 503 U.S. at 126, 112 S.Ct. 1061 (quoting *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189, 196, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) (quoting *Davidson v. Cannon,* 474 U.S. 344, 348, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986))). "The touchstone of due process is protection of the individual against arbitrary action of government." *Wolff v. McDonnell,* 418 U.S. 539, 558, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *see, e.g., Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (the Fourteenth Amendment guarantee protects against government power arbitrarily and oppressively exercised).

The concept of "substantive due process," however, has "'scarce and open-ended' 'guideposts,'" *Albright v. Oliver,* 510 U.S. 266, 275, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (plurality opinion) (quoting *Collins,* 503 U.S. at 125, 112 S.Ct. 1061), and the Supreme Court has repeatedly held, that "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.'" *Albright,* 510 U.S. at 273, 114 S.Ct. 807 (plurality opinion) (quoting *Gra-*

*ham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). *See also Albright,* 510 U.S. at 276, 114 S.Ct. 807 (Justice Scalia, concurring) (" 'the more generalized notion of "substantive due process" ' ... cannot be used to impose additional requirements upon such of the States' criminal processes as are already addressed (and left without such requirements) by the Bill of Rights" (quoting *Graham v. Connor,* 490 U.S. at 395, 109 S.Ct. 1865)).

■ The Fourth Amendment, which applies to the states through the Fourteenth Amendment, *see Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), prohibits "unreasonable ... seizures," U.S. Const. amend IV. Indisputably, an arrest is a seizure. Further, although plaintiffs would have us rule that a "seizure" within the meaning of the Fourth Amendment consists only of the initial act of physical restraint, and nothing thereafter (*see* plaintiffs' reply brief on appeal at 4–5), it is well established that the Fourth Amendment governs the procedures applied during some period following an arrest. *See, e.g., Powell v. Nevada,* 511 U.S. 79, 80, 114 S.Ct. 1280, 128 L.Ed.2d 1 (1994); *County of Riverside v. McLaughlin,* 500 U.S. 44, 56, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991) (*"McLaughlin"*); *Gerstein v. Pugh,* 420 U.S. 103, 125, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975) (*"Gerstein"*). *See also Albright,* 510 U.S. at 278–81, 114 S.Ct. 807 (Justice Ginsburg, concurring) (viewing a seizure within the meaning of the Fourth Amendment as continuing throughout the pretrial process, even if the arrestee is released, given the significant restrictions on, *inter alia,* his right to travel outside the jurisdiction). "Substantive due process analysis is ... inappropriate ... [where a] claim is 'covered by' the Fourth Amendment." *County of Sacramento v. Lewis,* 523 U.S. at 843, 118 S.Ct.

1708. Accordingly, given that plaintiffs complain that defendants' failure to issue them desk appearance tickets unconstitutionally prolonged their respective periods of postarrest detention, we turn to Fourth Amendment principles.

■ The Fourth Amendment test of reasonableness "is one of 'objective reasonableness'." *Graham v. Connor,* 490 U.S. at 399, 109 S.Ct. 1865; *see, e.g., Scott v. United States,* 436 U.S. 128, 137–39, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978); *Tennessee v. Garner,* 471 U.S. 1, 8–9, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985); *United States v. Robinson,* 414 U.S. 218, 236, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The "question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor,* 490 U.S. at 397, 109 S.Ct. 1865. "[T]he subjective motivations of the individual officers ... ha[ve] no bearing on whether a particular seizure is 'unreasonable' under the Fourth Amendment." *Id.* "An officer's evil intentions will not make a Fourth Amendment violation out of ... objectively reasonable" conduct; "nor will an officer's good intentions make ... objectively unreasonable ... [conduct] constitutional." *Id.; see, e.g., Scott v. United States,* 436 U.S. at 138, 98 S.Ct. 1717.

■ In the context of pretrial detention, the Supreme Court has held that, when there has been a warrantless arrest, the Fourth Amendment requires a prompt judicial determination of probable cause as a prerequisite to an extended pretrial detention. In *Gerstein,* the Court stated that a person arrested without a warrant must be brought before a neutral magistrate promptly. *Gerstein,* 420 U.S. at 113–14, 95 S.Ct. 854. "Significantly, the [*Ger-*

*stein* ] Court stopped short of holding that jurisdictions were constitutionally compelled to provide a probable cause hearing immediately upon taking a suspect into custody and completing booking procedures." *McLaughlin,* 500 U.S. at 53, 111 S.Ct. 1661. Rather, *Gerstein* held "that the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to any *extended* restraint on liberty following an arrest." *Albright,* 510 U.S. at 274, 114 S.Ct. 807 (plurality opinion) (emphasis added).

The *Gerstein* Court "left it to the individual States to integrate prompt probable cause determinations into their differing systems of pretrial procedures." *McLaughlin,* 500 U.S. at 53, 111 S.Ct. 1661 (citing *Gerstein,* 420 U.S. at 123–24, 95 S.Ct. 854). The "purpose in *Gerstein* was to make clear that the Fourth Amendment requires every State to provide prompt determinations of probable cause, but that the Constitution does not impose on the States a rigid procedural framework. Rather, individual States may choose to comply in different ways." *McLaughlin,* 500 U.S. at 53, 111 S.Ct. 1661.

In *McLaughlin,* the Supreme Court explored what *Gerstein* meant by "promptly." Clearly, "prompt" does not mean "immediate." "Inherent in *Gerstein*'s invitation to the States to experiment and adapt was the recognition that *the Fourth Amendment does not compel an immediate determination of probable cause upon completing the administrative steps incident to arrest.*" *McLaughlin,* 500 U.S. at 53–54, 111 S.Ct. 1661 (emphasis added); *see id.* at 54, 111 S.Ct. 1661 ("Plainly, if a probable cause hearing is constitutionally compelled the moment a suspect is finished being 'booked,' there is no room whatsoever for 'flexibility and experimentation by the States.'" (quoting *Gerstein,* 420 U.S. at 123, 95 S.Ct. 854)). "*Gerstein*

held that probable cause determinations must be prompt—not immediate." *McLaughlin,* 500 U.S. at 54, 111 S.Ct. 1661.

However, the *McLaughlin* Court noted that "flexibility has its limits; *Gerstein* is not a blank check." 500 U.S. at 55, 111 S.Ct. 1661. Attempting to "articulate more clearly the boundaries of what is permissible under the Fourth Amendment" in light of the competing interests at stake, the *McLaughlin* Court stated that "a jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of *Gerstein.*" *Id.* at 56, 111 S.Ct. 1661. Thus, " 'prompt' generally means within 48 hours of the warrantless arrest." *Powell v. Nevada,* 511 U.S. at 80, 114 S.Ct. 1280. The *McLaughlin* Court cautioned, however, that

[t]his is not to say that the probable cause determination in a particular case passes constitutional muster simply because it is provided within 48 hours. Such a hearing may nonetheless violate *Gerstein* if the arrested individual can prove that his or her probable cause determination was delayed unreasonably. Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake. *In evaluating whether the delay in a particular case is unreasonable, however, courts .... cannot ignore the often unavoidable delays in transporting arrested persons from one facility to another, handling late-night bookings where no magistrate is readily available, obtaining the presence of an arresting officer who may be busy processing other suspects or securing the*

*premises of an arrest, and other practical realities.*

*McLaughlin,* 500 U.S. at 56–57, 111 S.Ct. 1661 (emphasis added).

Everyone agrees that the police should make every attempt to minimize the time a presumptively innocent individual spends in jail. One way to do so is to provide a judicial determination of probable cause immediately upon completing the administrative steps incident to arrest—[*i.e.*], as soon as the suspect has been booked, photographed, and fingerprinted.... The Constitution does not compel so rigid a schedule ....

*Id.* at 58, 111 S.Ct. 1661.

■ In the present case, plaintiffs fall well short of any showing that the refusal to issue desk appearance tickets to them immediately following their arrests and processing was objectively unreasonable. First, DATs are not required under New York law. The provision authorizing the issuance of a DAT states that when an officer is authorized to make a warrantless arrest (except with respect to certain categories of crimes not relevant here), "he *may* ... issue to and serve upon [the arrestee] an appearance ticket." N.Y.Crim. Proc. Law § 150.20(1) (emphasis added). The statute plainly does not make the issuance of a DAT mandatory.

Further, in light of the principles established by *Gerstein* and *McLaughlin,* the issuance of a DAT for the release of an arrestee immediately upon completion of the postarrest administrative procedures is not constitutionally required. New York's discretionary scheme with respect to the issuance of appearance tickets is well within the range of flexibility allowed to the states with respect to their postarrest procedures. What is constitutionally required is that, except in extraordinary circumstances, the arrestee be given a hearing into probable cause for the arrest within 48 hours. In New York, a probable cause determination is made at arraignment. *See generally Williams v. Ward,* 845 F.2d 374, 375 (2d Cir.1988), *cert. denied,* 488 U.S. 1020, 109 S.Ct. 818, 102 L.Ed.2d 807 (1989). The three plaintiffs who were arraigned made those court appearances and were released less than 24 hours after they were arrested. The other four plaintiffs were released after they had been in custody for some 6–9 hours. In sum, the duration of plaintiffs' detentions did not come close to the presumptively unreasonable 48–hour mark.

Finally, as described in Part I.A. above, there is no dispute that, *inter alia,* the demonstrators overflowed the sidewalks and flooded the streets; that there were police announcements that the participants must be on the sidewalk and that those remaining in the roadway would be arrested; that each of the plaintiffs was in an expressly prohibited place when arrested; and that a large group of the demonstrators sat in the roadway and sought to "TAKE THE STREETS!"

Nor is there any genuine dispute that substantial police manpower was needed (even after the arrests, there were nearly 4,000 demonstrators) and that there was potential for physical injury. Plaintiffs did not dispute, for example, that Takacs, who heard the police instruction to get on the sidewalk but remained in the middle of the roadway until he was arrested, loudly questioned his arrest, engaged in a physical struggle with the officer who arrested him ("even surpris[ing him]self how long [he] resisted and struggled" (Defendants' 56.1 Stmt. ¶ 164 (quoting testimony of Takacs at an administrative hearing pursuant to N.Y. Gen. Mun. Law § 50–h (McKinney 1999)))), and was subdued only after he was surrounded by several officers. (*See* Defendants' 56.1 Stmt. ¶¶ 161–166; Plaintiffs' Opp. 56.1 Stmt. ¶¶ 161–162, 165–166.)

In all the circumstances, we cannot conclude that defendants' refusal to issue desk appearance tickets to plaintiffs on the evening of the Shepard demonstration was objectively unreasonable. Accordingly, we affirm the dismissal of plaintiffs' denial-of-desk-appearance-tickets claims. In light of that affirmance, plaintiffs' conditional requests, seeking reversals of the denial of their motion for class action certification and the refusal to exercise supplemental jurisdiction over their state-law claims, are moot.

## CONCLUSION

We have considered all of plaintiffs' arguments on this appeal and have found them to be without merit. The judgment of the district court is affirmed.